UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  No. 4:25-cr-00266-SRC |
| BRIDGET THEBEAU, | ) ) ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW the United States of America, by and through Thomas C. Albus, United States Attorney, and Justin M. Ladendorf, Assistant United States Attorney, for the Eastern District of Missouri, and for its sentencing memorandum, states as follows:

**I.   INTRODUCTION**

Over the course of a decade, Defendant Bridget Thebeau embezzled nearly $4 million from her former employer (the "Company"). After Thebeau's scheme came to light, she initially tried to lie her way out of trouble but eventually waived indictment and pleaded guilty to five counts of wire fraud. Thebeau's total offense level is 28 and she has a criminal history category of I, so her Guidelines range is 78-97 months. Doc. [22] at ¶ 71.

While Thebeau enabled the Government to conserve resources by rather quickly accepting responsibility, that does not outweigh the fact that she lied, cheated, and stole for years on end, which caused serious, irreparable harm to both the Company and its owner. As a result, and for the reasons detailed below, the Government submits that the Section 3553(a) factors support the imposition of a within-Guidelines sentence consisting of a 90-month prison term, three years of supervised release, and an order that Thebeau make full restitution in the amount of $3,821,152.73.

1

## II.  DISCUSSION

### A.  Nature, circumstances, and seriousness of the offense

Thebeau worked for the Company—a small, family-owned business based in Chesterfield—for roughly two decades, beginning in the early 2000s and continuing through 2024. Doc. [22] at ¶ 15.[1] Unbeknownst to the Company, Thebeau spent nearly half of that time embezzling millions of dollars, stopping only once she got caught and her years of lies unraveled. As was later uncovered, Thebeau's long-running embezzlement scheme impacted nearly every aspect of the Company's business, including by creating a false picture of its financials, which has jeopardized the Company's continuing viability as well as the owner's retirement plans. Doc. [28]. Thus, the nature, circumstances, and seriousness of Thebeau's offense justify a 90-month sentence.

Thebeau started her fraud scheme by manipulating purchase orders that the Company issued to its China-based suppliers so that it could fulfill orders from its customers. Doc. [22] at ¶¶ 15–16, 18. Specifically, Thebeau inflated the amounts of those purchase orders by adding fictitious charges or increasing the quantities and per unit prices of the items ordered. *Id.* at ¶ 18. After manipulating the purchase orders, Thebeau falsely represented to the Company's owner that the purchase orders were entirely legitimate so that she could obtain his approval to wire funds from the Company's bank account to the suppliers. *Id.* at ¶ 16. As Thebeau intended, those wires resulted in the Company paying the suppliers more than what was owed to fulfill the valid aspects of the purchase orders. Then, after receiving the Company's money, the suppliers kicked back approximately half of the inflated amounts to Thebeau by wiring money to one of her Bank of America accounts—an account that she opened in 2015, which, unlike all of her other accounts that were jointly held with family members, listed her as the sole signatory. *Id.* at ¶¶ 14, 20. The

---

[1] The Government understands from the Company that Thebeau's employment ended in December 2023, but she continued to assist (and be paid by) the Company until March 2024, when her embezzlement scheme was discovered.

statements for that account showed that its exclusive source of deposits was incoming wires from numerous Chinese companies and individuals, which started immediately after Thebeau opened the account and continued through April 2024.

As Thebeau's scheme progressed, she also began creating completely fictitious purchase orders. *Id.* at ¶ 18. To make it appear that those purchase orders were real, Thebeau later provided the Company with fictious shipping labels and bills of lading, which falsely reflected that the Company's suppliers had fulfilled the purchase orders. *Id.* at ¶ 20. As was the case before, once Thebeau duped the Company's owner into giving her permission to wire the Company's money to its suppliers, the suppliers (or some other Chinese company or individual) wired approximately half of the Company's money back to Thebeau's Bank of America account. *Id.* at ¶¶ 14, 20.

All told, between 2015 and 2023, Thebeau doctored 152 actual purchase orders and issued 82 completely fictitious purchase orders. *Id.* at ¶ 18. For each one, she lied to the Company's owner about its legitimacy so that she could get his approval to wire the Company's money—$3,821,152.73 in total—to the China-based suppliers. *Id.* at ¶ 20. And at the end of the day, more than half of that money came back from China and into her Bank of America account. *Id.*

Thebeau went to great lengths to conceal her scheme by using several different tactics. She created fictitious invoices that she falsely claimed she had issued to the Company's customers for the purported fulfillment of the fraudulent purchase orders. *Id.* She supplied false information to the Company's external accountants, such as by instructing them to apply portions of customer payments to the fictitious invoices instead of the legitimate invoices for which they were intended, and by providing them with fabricated credit memos to reduce the outstanding balances of fictitious invoices that she knew would never be paid. *Id.* And she provided the Company's owner with false information regarding open accounts receivable to deceive him into believing that the

3

Company would have substantial revenues coming in from longtime, reputable customers. *Id.* Keeping up that juggling act to ensure that her scheme would not be discovered and could continue for so many years unquestionably required extensive planning and coordination by Thebeau.

Thebeau's embezzlement has caused irreparable damage to the Company's owner. Doc. [28]. Instead of the owner and his fiancé (who also works for the Company) using the money that Thebeau falsely told them the Company would be receiving from its customers to retire as they had planned, they now find themselves having to sell assets and struggling to save the Company that they spent their entire careers building. *Id.* Among other things, they have had to sell the Company's office building (of 20 years) to pay bills and manage expenses, they have had to devote time and resources to repairing the Company's relationships with its customers, accountants, and financial institutions, and they have had to take on debt because the Company is no longer able to self-finance customer orders as it had always been able to do in the past. *Id.*

But even worse than the financial hardship caused by Thebeau is the emotional toll that her selfish actions have taken on the Company's owner—the very person who paid her a six-figure salary and allowed her to primarily work from home so that she could be present for her kids. *Id.* The Company's owner earned the opportunity to live out his golden years in peace by traveling, spending time with family, and pursuing hobbies—all things that he and his fiancé sacrificed for the Company that Thebeau singlehandedly destroyed. Now, however, he and his fiancé are riddled with anxiety and stress over concerns about what their future is going to look like, such as whether they will be able to keep their 116-year-old farmhouse, whether they will be able to afford healthcare, and whether they will ever be able to pursue the dream of retirement that once felt so close but currently seems like it will never be within their reach. *Id.* All because Thebeau— someone they trusted and treated like family—robbed them blind.

4

### B.  History and characteristics of the defendant

In the Government's view, nothing in Thebeau's background militates against the imposition of a 90-month term of incarceration. Thebeau's lack of criminal history, Doc. [22] at ¶ 46, does not outweigh the fact that she was lying, cheating, and stealing every day for nearly 10 years. And the unspecified "problems" that Thebeau claims to have experienced in her childhood are part of the distant past, as reflected by the circumstances of her adult life, which, until after her offense conduct, consisted of a happy marriage, three healthy children, a nice home in an upper middle-class neighborhood, and a well-paying job. *Id.* at ¶¶ 49–51, 63–64. While the Government sympathizes with the fact that one of Thebeau's children now has a serious health condition, *id.* at ¶ 50, Thebeau made a conscious decision day in and day out to prioritize herself over her family. Actions have consequences, and, unfortunately, one of the consequences for Thebeau is that she will not be present to care for her children during any term of incarceration.

There is no apparent explanation for why Thebeau did what she did. She did not do it because of a drug or gambling addiction. *Id.* at 56. She did not do it because of a mental health condition. *Id.* at 53–54. She did not do it because of a lack of income. *Id.* at ¶¶ 63–64, 67–68. She did not do it because the Company and its owner treated her unfairly. So why then? The only explanation that the Government can come up with is greed, pure and simple. As another court in this Circuit aptly observed, "[a] crime of fraud by one who already has more than enough—and who cannot argue that he suffered a deprived or abusive childhood or the compulsion of an expensive addiction—is simply a crime of greed." *United States v. Miell*, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010) (determining that the defendant's history and characteristics warranted "more significant punishment than the advisory guidelines might mete out, despite [his] lack of prior criminal history"), *aff'd*, 661 F.3d 995 (8th Cir. 2011).

5

### C. Other sentencing factors

Several other sentencing factors further reinforce that a 90-month prison sentence for Thebeau is appropriate. First, general deterrence, which is "one of the key purposes of sentencing," *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006), cuts in favor of a substantial sentence: "White collar criminals may be particularly susceptible to general deterrence because '[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment,'" *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013)). Second, as reflected by the Judiciary Sentencing Information (JSIN) data, a within-Guidelines sentence of 90 months would not result in an *unwarranted* sentencing disparity between Thebeau and similarly situated defendants. According to that data, 25% of defendants whose primary Guideline was Section 2B1.1 and whose Final Offense Level and Criminal History Category matched Thebeau's received a within-Guidelines sentence (that number increases to 34% when excluding defendants who received a substantial assistance departure). Third, a 90-month term of incarceration represents a just punishment when considering that Thebeau carried out her scheme for approximately 120 months. It is difficult to imagine how it could be considered unjust for her to serve less time in prison than she spent stealing millions of dollars from the Company.

### III. CONCLUSION

For these reasons, the Government respectfully requests that the Court sentence Thebeau to 90 months in prison, to be followed by a three-year term of supervised release, and order that she pay full restitution in the amount of $3,821,152.73.

        Respectfully submitted,

        THOMAS C. ALBUS
        UNITED STATES ATTORNEY


        */s/     Justin M. Ladendorf*
        JUSTIN M. LADENDORF, #68558MO
        ASSISTANT UNITED STATES ATTORNEY
        Thomas F. Eagleton Courthouse
        111 South Tenth Street, 20th Floor
        St. Louis, Missouri 63102
        (314) 539-2200

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 22, 2025, a true and accurate copy of this document was filed with the Court's electronic file-management system for service upon all counsel of record.

        */s/ Justin M. Ladendorf*
        JUSTIN M. LADENDORF, #68558MO
        Assistant United States Attorney